## LUCIUS B. MANTONYA

### v.

### GEORGE REILLY et al.

*Opinion filed February 19, 1900.*

1. MECHANICS' LIENS—*sections 29 and 45 of act of 1874 are to be read together.* Sections 29 and 45 of the Mechanic's Lien act, (Rev. Stat. 1874, pp. 886, 889,) relating to sub-contractors' liens, are to be read and construed together.

2. SAME—*upon abandonment by contractor, sub-contractor is not confined to section 45.* Upon abandonment of work by the contractor, the sub-contractor's remedy, under the act of 1874, is prescribed by section 45, if there was no fraud in letting the contract; but where the contract price was fixed unreasonably low for the purpose of defrauding sub-contractors, the sub-contractor may also proceed under section 29.

3. SAME—*sub-contractors' rights under act of 1874.* Under section 45 of the act of 1874 sub-contractors are entitled to liens where the contractor abandons the work, such liens being, however, limited to the contract price, less payments rightfully made by the owner; but under section 29, where the contract price has been fixed unreasonably low by the contractor and owner for the purpose of defrauding creditors, then a fair price for the work, when ascertained, is to be treated as the contract price.

4. SAME—*when building is properly decreed to be sold as a whole.* A building erected upon one lot and the adjoining ten feet of another lot, but under the same roof, is properly decreed to be sold as a whole, to satisfy the mechanic's lien.

5. SAME—*effect of failure to serve notice of lien.* Where notice of a mechanic's lien is not served upon the wife, who is joint owner of the land with her husband, her interest in the premises is not chargeable with the lien under the act of 1874.

6. ESTOPPEL—*when owner is estopped to claim that certain things were included in sub-contract.* Where a sub-contractor's bid is based wholly upon detail drawings furnished him, the owner is estopped to claim that the sub-contract embraced parts of the work not shown on the drawings.

7. EVIDENCE—*corroborated testimony of witness who has sworn falsely may be regarded.* Corroborated testimony of a witness may be regarded even though he may have sworn falsely to other material matters in the case.

8. SAME—*failure to produce expected and available evidence raises a presumption against the party.* Failure of the owner of a building to

produce expected evidence in the form of architects' certificates paid by him and relied upon by the other parties to show facts against his interest, raises a presumption against him, where his failure to preserve them is contrary to his custom and their absence is not satisfactorily accounted for.

9. Parties—*objection for want of parties cannot be first raised on appeal.* An objection for want of proper parties, not made before the master or the trial court, cannot be raised on appeal.

10. Appeals and errors—*when master's finding will be presumed warranted by the evidence.* The master's allowance of a claim for mechanic's lien for materials found by him to have been furnished and not paid for will be presumed to be warranted by the evidence, where none of the testimony as to the claim is abstracted.

*Mantonya* v. *Reilly,* 83 Ill. App. 275, affirmed.

Appeal from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. Murray F. Tuley, Judge, presiding.

Rich & Loehr, (W. R. Hauze, and Warren B. Wilson, of counsel,) for appellant.

Albert N. Eastman, and Haynes & Peale, for appellees.

Per Curiam: An application for a mechanic's lien was filed against the appellant by George Reilly, a sub-contractor, and the Powers Duplex Regulator Company became a party defendant to the petition and filed a cross-petition. A hearing was had in the circuit court of Cook county, and a decree was entered according to the prayer of the petition as amended and the cross-petition, and an appeal was prosecuted to the Appellate Court for the First District. The opinion of that court by Adams, J., and the statement of facts, are as follows:

"George Reilly, appellee, filed a petition for a mechanic's lien, as sub-contractor, and the Powers Duplex Regulator Company became a party defendant to the petition, and filed, as an original contractor, a cross-peti-

tion for a lien. There were other parties defendant to Reilly's petition who filed cross-petitions claiming liens, but their claims were disallowed, so that the sole contest here is between the appellees named and appellant. The court decreed that Reilly and the Powers company were entitled to liens, the former for $2272.59 and the latter for $237.09.

"Appellant and his wife were the owners, each of one undivided half, of the premises. May 24, 1893, appellant and John W. Hersey entered into a contract, evidenced by writing of that date, by which Hersey agreed, for the consideration of $31,000, to furnish all the labor and material for the construction of a four-story-and-basement stone and brick apartment building at Nos. 374, 376 and 378 Dearborn avenue, Chicago, Illinois, excepting steam heating, mantels, gas fixtures and electric work, in accordance with drawings and specifications furnished by John J. Kouhn, architect, in a good, workmanlike and substantial manner, to the satisfaction of the owner and under the directions of said architect and the owner, 'to be testified by a writing under hand.' The agreement provided, among other things, that Hersey was to be paid from time to time, as the work should progress to the approval of the owner or any one whom he might select, by certificates from the architect, not to exceed seventy-five per cent of the amount of the material or labor employed. The said architect was made the arbiter of any disputes which might arise between the parties, his decision to be final and binding on the parties. Delay caused by either party was to be compensated to the other party at the rate of $25 per day. The contract contained this provision: 'Plans and specifications are a part of this contract. Anything on plans and not on specifications, or *vice versa*, shall be considered a part of this contract.' The contract also contained the following: 'The work shall be done in accordance with working drawings furnished by architect whenever required.'

"November 10, 1893, appellee Reilly filed his petition setting up the above mentioned contract between Mantonya and Hersey, alleging that Hersey entered upon the work and continued the same until August 25, 1893, when he abandoned it; that petitioner is informed and believes that Hersey performed the greater part of the work, and that Mantonya, at time of abandonment, was indebted to him in the sum of $9000; that Kouhn, the architect, had issued to Hersey a certificate to the extent of $9000, which Mantonya refused to pay; that petitioner, June 3, 1893, contracted with Hersey to do the cut stone work on the building, setting out the contract in full; that petitioner continued to work under his said contract till August 23, 1893, at which date he had substantially performed the same; that Hersey refused to pay him the money due him, and he refused to proceed; that then Mantonya, to induce petitioner to proceed with the work, told him that he (Mantonya) was indebted to Hersey in an amount exceeding the contract price in petitioner's contract with Hersey, and that if petitioner would proceed with the work he (Mantonya) would retain from the money which he owed Hersey enough to pay petitioner in accordance with his contract, and petitioner, relying on such assurance, continued and performed his contract. It is then averred that neither Hersey nor Mantonya, though frequently requested so to do, have paid petitioner; that there is due petitioner $2000, and that he served appellant with notice of lien. The petition makes appellant and others parties, and concludes with the usual prayer and for general relief.

"January 16, 1894, Reilly filed an amendment to his petition, alleging, as an excuse for not serving Mantonya with a copy of his contract with Hersey, that there was only one copy, which was in the possession of Kouhn, who, at Mantonya's instigation, refused petitioner access to it. May 6, 1896, a second amendment to Reilly's petition was filed, which amendment is as follows: 'After the

setting forth of the contract by and between Mantonya and the said Hersey, and immediately after the same, insert as follows: Your petitioner further shows unto your honors that the said contract, as aforesaid, made and entered into by and between the said Hersey and the said Mantonya, though executed in person and in the name of said Lucius B. Mantonya, was so executed for and on behalf of himself and his wife, Ella W. Mantonya, and in their joint interests and as a contract for both, and with her knowledge, consent and approval, for their joint interests and benefit; and your petitioner further shows unto your honors, that he is informed and believes that, though the consideration of the said contract specified therein is $31,000, yet the true and real consideration for the doing of said work was a large sum in excess of that, to-wit, $10,000 more, to-wit, the sum of $41,000, and that in the entering into and making of said contract the said Hersey and Mantonya conspired and confederated together, and pretended to contract for a much smaller sum than was really agreed to be paid for the work and labor so to be performed, for the purpose of preventing the creditors of the said Hersey from obtaining the benefits of said contract, and of defrauding and cheating them out of such sums of money as might be justly due and owing from the said Hersey to them for labor and material thereafter performed on the said building of the said Mantonya, in pursuance of the said undertaking between him and the said Hersey,' etc.

"August 9, 1895, the issues having been made up by proper pleadings, the cause was referred to George Mills Rogers, master in chancery, to take and report proofs, with his conclusions thereon. The master's report was filed December 20, 1897. Fifty objections were filed by appellant to the report before the master, all of which he overruled. These objections, with the exception of ten of them, which were waived by appellant in the circuit

court, stood as exceptions in said court, and were over-ruled by the court and the master's report confirmed.

"The contracts between Mantonya and Hersey and be-tween Hersey and Reilly having been made in 1893, the law then in force, namely, the act of 1874, entitled 'An act in relation to liens,' as amended, must control as to the rights of the parties. *Springer* v. *Bowerman*, 75 Ill. App. 352; Hurd's Stat. 1893, p. 930; *Andrews & Johnson Co.* v. *Atwood*, 167 Ill. 249.

"Appellant's counsel insist that in case of the aban-donment of the work by the chief contractor the remedy of a sub-contractor is exclusively under section 45 of the act, and cannot be under section 29, as was held by the master and the court.   Sections 29 and 45 of the act are as follows:

"'Sec. 29. Every sub-contractor, mechanic, workman or other person, who shall hereafter, in pursuance of the purposes of the original contract between the owner of any lot or piece of ground, or his agent and the original contractor, perform any labor or furnish any materials in building, altering, repairing, beautifying or ornament-ing any house or other building or appurtenance thereto, on such lot or on any street or alley, and connected with such building or appurtenance, shall have a lien for the value of such labor and materials upon such house or building and appurtenances, and upon the lot or land upon which the same stands, to the extent of the right, title and interest of such owner at the time of making the original contract for such house or the improvement; but the aggregate of all the liens hereby authorized shall not exceed the price stipulated in the original contract between such owner and the original contractor for such improvements.   In no case shall the owner be compelled to pay a greater sum for or on account of such house, building or other improvements, than the price or sum stipulated in said original contract or agreement, unless payments be made to the original contractor, or to his

order in violation of the rights and interests of the persons intended to be benefited by section 35 of this act: *Provided*, if it shall appear to the court that the owner and contractor fraudulently, and for the purpose of defrauding sub-contractors, fixed an unreasonably low price in their original contract for the erection or repairing of such building, then the court shall ascertain how much of a difference exists between a fair price for the labor and material used in said building or other improvements, and the sum named in said original contract. Said difference shall be considered a part of the contract, and be subject to a lien, but in no case shall the original contractor's time or profits be secured by this lien only so far as the sum named in the original contract or agreement.'

"'Sec. 45. Should the original contractor, for any cause, fail to complete his contract, any person entitled to a lien as aforesaid may file his petition in any court of record, against the owner and contractor setting forth the nature of his claim, the amount due, as near as may be, and the names of the parties employed on such house or other improvement subject to liens; and notice of such suit shall be served on the persons therein named; and such as shall appear shall have their claims adjudicated, and decree shall be entered against the owner and original contractor for so much as the work and materials shall be shown to be reasonably worth according to the original contract price, first deducting so much as shall have been rightfully paid on said original contract by the owner, and damages, if any, that may be found to be occasioned the owners by reason of the non-fulfillment of the original contract; the balance to be divided between such claimants in proportion to their respective interests, to be ascertained by the court. The premises may be sold as in other cases under this act.'

"We cannot agree with the view of appellant's counsel. Section 45 evidently relates to cases in which the

contract price has been fairly and without fraud fixed by the parties, and the proviso in section 29 to cases in which the contract price has been fraudulently fixed by the owner and contractor unreasonably low, for the purpose of defrauding sub-contractors. The two sections are parts of the same act, relate to the same subject matter, namely, the liens of sub-contractors, and must be read and construed together. So reading and construing them, sub-contractors are entitled to liens when the principal contractor abandons his contract, such liens to be limited to the original contract price, less payments rightfully made on the original contract by the owner; but in case the original contract price has been fraudulently fixed unreasonably low by the owner and original contractor for the purpose of defrauding sub-contractors, then the difference between the contract price so fixed and a fair price for the labor and material, when ascertained, is to be regarded as a part of the contract price,—or, in other words, such fair price, when ascertained, is to be regarded as the contract price. That appellees have taken the necessary steps to perfect their liens, on the hypothesis that they would be entitled to liens in any event, is not contested.

"July 23, 1893, appellee Reilly, and Hersey, executed a contract in writing, by which Reilly agreed to furnish the labor and material for the cut stone work in accordance with the drawings and specifications, for the consideration of $3000. By the contract Reilly was to be paid on certificates of the architect, the certificates, while the work was progressing, not to exceed seventy-five per cent of the value of material and labor. No certificates have ever been issued to him and he has received on his contract only $1000, which was paid to him by Hersey. The objections urged in argument to the claim of appellee Reilly, in so far as they relate to the performance of his contract and the amount found to be due to him by the master, are, that he omitted to furnish quoins, and that

the master, in stating his account, did not charge him with their value; that he also omitted tuck-pointing and the curbing along the lot line, and that the master, in stating his account, did not charge him enough for these omissions. Rosenstock, the architect who drew the plans and specifications and superintended the completion of the work after its abandonment by Hersey, testified, as did also Hersey, that the detail or working drawings did not show quoins. Hersey, who contracted with Reilly, further testified that Reilly figured from the detail drawings. The detail drawings having been furnished to Reilly from which to make an estimate for the purpose of bidding on the work, and the drawings not showing quoins, appellant is estopped to claim that Reilly's contract included quoins. *Sexton* v. *City of Chicago*, 107 Ill. 323.

"Mantonya testified that the tuck-pointing cost $169, and that the bill for the flagging or fence coping (meaning the curbing) was $79.55. There was no attempt made to prove that these were reasonable prices. Rosenstock, appellant's architect, testified that the value of the curbing was $67.50, and that the tuck-pointing was reasonably worth $75. These figures were adopted by the master,—properly, as we think,—and the amounts were charged against Reilly in the statement of his account. The master, after deducting from Reilly's contract price the amount paid him up to August 15, 1893, namely, $1000, the amount charged him for omission of tuck-pointing, $75, and the amount charged him for omission of curbing, $67.50, credited him with interest on the remainder from August 23, 1893,—the date of Reilly's lien notice served on Mantonya, and about the date when Reilly quit work. The court, in its decree, allowed Reilly interest on the balance found due to him by the master from August 20, 1893, to the date of the decree. We find no error in this regard. The evidence was ample to warrant the master in finding that Reilly, with the small exceptions noted, performed his contract. Reilly testified that after he quit

work he had a conversation with Kouhn, the architect, who had been discharged by Mantonya about August 17, 1893, and that Kouhn told him his work was first-class, that he found no objection to it, and that he would issue a certificate to him for his money, but that he had been discharged by the owner. Kouhn, called by Mantonya, testifying in relation to Reilly's work, made no objection to the work, except to mention the omissions of tuck-pointing and curbing. Hersey testified that August 23, 1893, Reilly's work was entirely completed, with the exception of tuck-pointing, which could not be done till after the building was ready for it. The master finds, and the evidence shows, that when Reilly quit work because he could not get either certificates or money on his contract, the building had not so far progressed that the tuck-pointing could be done, and that he was never requested to do it.

"The master finds: 'Hersey is manifestly not to be relied on, for he contradicts himself and is contradicted by others and by documentary proof to such an extent that his testimony is of no value except as indicating his own character.' If this is to be understood as meaning that Hersey's testimony is to be wholly disregarded in considering the cause, we cannot agree with the master. Even when a witness willfully swears falsely in relation to a material fact, a jury is not, from that mere circumstance, warranted in wholly disregarding his testimony, and an instruction to that effect would be erroneous. In such case only the uncorroborated testimony of the witness may be disregarded. His corroborated testimony may be considered. These remarks are made because Hersey's testimony has been largely commented on by counsel and is necessary to be referred to in this opinion.

"This occurs in the master's report: 'In my opinion, and I so find, there were at least two contracts, and possibly three, drawn up, and the $31,000 contract was intended to be used to defraud the sub-contractors, one of

the others being the contract under which the work was done.' Considering the whole report, it is, in substance, that the owner and original contractor fraudulently fixed the price ($31,000) unreasonably low for the purpose of defrauding sub-contractors. That $31,000 was an unreasonably low price for the work contracted to be done by Hersey is, we think, clearly shown by a preponderance of the evidence. Rosenstock was the first architect employed by Mantonya, and after he had prepared the plans and specifications for the building he advertised for bids, and received bids varying from $40,000, the lowest, to $42,000, the highest. The bids were submitted to appellant, who does not differ much from Rosenstock as to the amount of the lowest bid. Appellant says the lowest was $39,000. Hersey abandoned the work August 21, 1893. At that date he had been paid on architect's certificates $15,000. On the hypothesis that certificates were issued for only seventy-five per cent of the value of the labor done and materials furnished, as provided by the contract, the estimate of the architect of the value of such labor and material when he issued the last certificate, which, with those previously issued, amounted to $15,000, must have been $20,000,—$15,000 being seventy-five per cent of that sum. The provision in the contract is: 'The contractor shall be paid from time to time, as the work progresses to the approval of the owner or any one he may select, by certificates from the architect not to exceed seventy-five per cent of the amount of material and labor employed.' It is a legitimate conclusion that the architect, in issuing certificates for $15,000, estimated the value of the labor and material furnished by Hersey at $20,000, and that appellant, who, as appears from the record, was certainly the reverse of negligent in guarding his own interests, by paying the certificates approved the architect's estimate. It cannot be presumed that the architect, in issuing the certificates, violated his duty, or that appellant, in paying them, neglected his interest.

That the estimate, $20,000, was substantially correct is
shown by the testimony of other witnesses. The follow-
ing named witnesses estimated the value of the labor
and material in the building when Hersey abandoned the
contract, as follows: Samuel Pigott, who completed the
carpenter work by contract with appellant, $15,000; John
M. Bergstrom, $15,000 or $15,500; G. W. Straub, $16,696;
Jules DeHorvath, architect, $16,413.60; Richard Rosen-
stock, $19,250; John M. Dunphy, $22,323.35. Mantonya
testified that about September 1, 1893, Rosenstock exam-
ined the building and made an estimate of the value of
the labor and material in it, by items, which he, Man-
tonya, took down in a book, and which amounted in all
to $14,800. Charles Suhr, appellant's employee, corrob-
orates appellant. Rosenstock testified that he never
made an estimate of the value of the labor and material
at $14,800. The master adopted Rosenstock's estimate,
$19,250, and, as we think, reasonably. As heretofore
stated, Rosenstock was first employed as the architect
of the building and prepared the plans and specifications,
but, owing to some disagreement between him and ap-
pellant, appellant discharged him and employed Kouhn.
Subsequently, about August 17, 1893, appellant, not being
able to agree with Kouhn, discharged him, and about
September 1, 1893, again employed Rosenstock to super-
vise the completion of the building in accordance with
the plans and specifications which he, Rosenstock, had
previously prepared. Rosenstock having prepared the
plans and specifications, and having been employed to
superintend the completion of the building in accordance
with them, and it being his duty to advertise for bids for
that purpose, his attention was necessarily called to the
labor and material already performed and furnished, and
his estimate, therefore, is as reliable as any other wit-
ness, if not more so. It cost Mantonya $23,776.06 to com-
plete the work contracted to be done by Hersey, which,
added to $15,000 paid to Hersey on architect's certifi-

cates, made the total cost of the building to appellant $38,776.06.

"Evidence was produced on behalf of appellant, for the purpose of proving that the work contracted for by Hersey could have been done for $31,000. Samuel Pigott having stated that he was familiar with the value of labor and material from May till September, 1893, both months inclusive, this occurred: 'Q.—You may state, if you will, whether the building could have been constructed at that time, exclusive of the steam-heating, the electric wiring and grille work, for $31,000? A.—It might have been. There is nothing impossible.' The question did not direct the witness' attention to any particular month, and what month he had reference to by his answer is not apparent. He testified, however, that before Hersey's contract was made he bid $15,130 for doing the carpenter and joiner work. He had testified that the value of the carpenter work done by Hersey was $2950, and also that his bid for completing the carpenter work was $9200, which would make the total value $12,150; and on being asked to explain the inconsistency of these figures with his original bid of $15,130, he said that when he first bid, labor and material were higher than when he bid in September, 1893. In Bergstrom's examination this occurred: 'Q.—Well, could the mason work, the carpenter work, the cast-iron work, the roof, galvanized cornice, the plumbing, the plastering and painting, as provided in these plans and specifications, have been done in the summer of 1893 for the sum of $31,000? A.—Well, it is only my guess, but I think it could have been done, but I don't think anybody would get rich at it,' etc. Horvath, architect, testified that the work could have been done in the summer of 1893 for $31,610. It does not appear from the evidence of this witness that he examined the building. He merely computed the number of cubic feet in the building from data obtained from the plans and specifications, and multi-

plied it by 7½, assuming, from what he says was his experience in the construction of similar buildings in the summer of 1893, that such work would cost about 7½ cents per cubic foot of area.

"Kouhn, having stated that he was familiar with the value of labor and material in the summer of 1893, was asked: 'I will ask you whether, in your opinion, $31,000 is a reasonable price for the work on the Mantonya flat building that was specified in Hersey's contract at that time? A.—I think there was no fortune in it, but a man could carry it through. At that time prices were very low,—just in the midst of a panic, if I remember right.' The witness does not answer whether the price stated was or was not reasonable. His answer rather indicates that, in his opinion, it was not. It is obvious that the true question is not what the building might have been constructed for in the summer of 1893, but what the fair value of labor and material was at the time the contract price of $31,000 was fixed. The master found that in September, 1893, when the contracts were made by appellant to complete the work comprised in the Hersey contract, the value of labor and material was twenty per cent less than at the time the Hersey contract was made, and therefore, in estimating what was a fair price for the work when the Hersey contract was made, the amount paid by Mantonya for the completion of the work should be increased twenty per cent. John M. Dunphy, building contractor, testified that building material was from twenty to twenty-five per cent lower in the fall than in the spring of 1893. Jules DeHorvath, architect and witness for appellant, testified that in March or April before the opening of the World's Fair, building material and labor were considerably higher than in September, 1893; that in March and April one had to pay $7 per day for a plasterer, the ordinary wages being $4 per day. G. W. Straub, an estimator and builder called by appellant, testified: 'Q.—How about the value of material in

March as compared with September? A.—There was a considerable difference. Q.—In what way? A.—It was less in August. It was less after the World's Fair was practically completed. That is the time of the slump in prices.' It is plain from the evidence of this witness that the slump in prices did not occur until after the date of the Hersey contract. Bergstrom, appellant's witness, testified that the labor and material were worth less in September, 1893, than in the preceding March of that year, but that a difference of twenty per cent would be pretty high. He did not, however, deny that there was that difference.

"We cannot say that the master was not warranted by the evidence in finding that the value of labor and material was twenty per cent lower in the fall of 1893 than in May, 1893, when the contract between appellant and Hersey was made.

"The next question is whether the price of $31,000 was fraudulently fixed, for the purpose of defrauding the subcontractors. Mantonya testified that he advertised for bids for the work at the same time that Rosenstock, his architect, advertised. Rosenstock, examined November 14, 1895, testified that after he had received bids he went to appellant's store, and that appellant showed him a bid of $31,000, which was in the form of a letter, the heading and signature of which were turned down, so that he, witness, could not see the name of the bidder and that he did not know who the bidder was; that he told appellant that the work could not be done for $31,000; that it was an impossibility, and that if he accepted the bid he would have to take the chances, knowing it was an underbid, and that appellant said he didn't care if it was; that the party was responsible; that he was not running the contractor's business. The witness further testified that on a subsequent occasion appellant told him that he didn't care whether he paid the sub-contractors or not; that he would pay the contractor. The same witness,

examined November 22, 1895, testified that about three weeks before the last date appellant came to his (witness') office and said to him that he wanted to show him the testimony in the case as far as it had progressed, so that he could get some pointers from witness; that in the conversation which ensued he asked appellant if it was not a fact that more than one contract was in existence, and that appellant said yes, there were three: one for $41,000, one for $55,000, and the original contract. By the original contract witness says he knew appellant meant the $31,000 contract. The witness having testified that, so far as he knew, the work was done under the $41,000 contract, the examination proceeded as follows: 'Q.—You don't know, though, in relation to that only as hearsay? A.—No, sir, I do not by hearsay; it was here admitted by Mr. Mantonya. Q.—When? A.—Oh, some time ago. Q.—Where? A.—Right in his own office. Q.—What did he say about it? A.—I said, 'Isn't it a fact, Mr. Mantonya, that you are working under a different contract than the $31,000 contract?' He said, 'Yes.' Q.—When did he say that? A.—Oh, that was while the building was being finished—when we were re-letting it. Q.—When it was being finished? A.—I made the remark, 'That comes pretty close to my figures then, doesn't it?' Q.—What was said then? A.—He said yes.'

"The circumstances of Rosenstock's employment to supervise the completion of the building after Hersey's abandonment of the work were not such as to induce him to favor sub-contractors. Rosenstock wrote to appellant the following letter, which appellant received:

"'L. B. Mantonya, Esq.:　　　　"'*September 8, 1893.*

"'*Dear Sir*—Concurrent to our conversations relative to assuming control of your building known as 374, 376 and 378 Dearborn avenue, my fees therefor shall be as follows: That is, if buildings are completed, and defeating the claims of sub-contractors who have furnished materials and labor previous to the first day of September without suit at law, you are to

pay me $1000. If only one-half are defeated you are to pay me $750, and if all of such contractors are allowed and paid you are to pay me $500. All of such payments are to be for my services in superintending the construction and finishing of said buildings. The sum of $250 is to be paid when the buildings are plastered, and the balance, if any, of above said amounts to be paid on the completion and settlement of all claims which may be against said buildings, on any of the above basis. No contracts to be let outside of my office or any settlement made without my consent. Please send me acceptance of this by bearer, and oblige.

" 'Very truly yours,   R. ROSENSTOCK.'

"Rosenstock testified that he would not say positively that Mantonya ever accepted the above proposition, and Mantonya testified that he never took any notice of it, but there is no evidence of any other proposition having been made by Rosenstock, and Mantonya, after receiving the proposition, employed Rosenstock to superintend the construction of the building. The letter, too, contains internal evidence that in the conversations which had occurred between Rosenstock and appellant the terms of Rosenstock's employment had been agreed on, and appellant had requested him to commit them to writing in the form of a proposition. It is inconceivable that any architect, of his own motion and without prior agreement, would have made such a proposition. The proposition having been accepted by the employment of Rosenstock, he was interested, to the extent of $500, in defeating the claims of all sub-contractors who had furnished labor or material prior to September 1, 1893.

"The terms of Rosenstock's re-employment are also evidence of appellant's intention in regard to sub-contractors. July 27, 1896, six months after Rosenstock had positively testified that appellant had told him there were three contracts and that the work was done under the $41,000 contract, he was called as a witness by appellant in rebuttal. The first question and answer in his examination are as follows: 'Q.—Mr. Rosenstock, you

stated here on November 22, 1895, that you had a conversation with Mr. Mantonya, wherein you said that you asked him if it was not a fact that there was more than one contract in existence, and that Mr. Mantonya told you, yes, there were three: one for $41,000, one for $55,000 and the original contract. Do you now swear that in that conversation with Mr. Mantonya he told you there were three contracts, or mentioned any figures? A.—You are getting me back here eight months and then want me to swear to that—ten months.' Here his answer was interrupted by counsel, who pressed the question, and the witness answered, 'I won't swear positively.' Then he is examined in regard to possible conversations between him and Hersey in relation to the contracts, and the examination proceeds thus: 'Q.—Isn't it a fact that in your previous testimony you confused the conversations you had with Hersey about the three contracts with the one you testified you had with Mantonya? A.—As I said before, I won't swear to that; no. Q.—Isn't it a fact that you did confuse, or may have confused, your conversations with Hersey? A.—I won't be positive either way. It may be and may not. It might be possible. Talking things over all around, things got jumbled. Q.—As a matter of fact, did Mr. Mantonya ever claim or admit to you that he was working under a $41,000 contract with Mr. Hersey, or under any contract other than $31,000? A.—You are taking me back considerable.' (Question read.) 'A.—He always claimed he was working under that $31,000 contract.'

"In view of the manifest hesitations and evasions of the witness, of which the answers last quoted are an example, the foregoing evidence is not worthy of serious consideration. On cross-examination, the witness being asked to explain his apparent doubts now, in view of his previous positive testimony, said: 'Some time ago— I can't tell you the exact date—I had Mr. Mantonya before a justice of the peace, wherein Mr. Hersey positively

swore that he was working under a $41,000 contract, and later on I found it was nothing of the kind.' How this is explanatory of the former testimony of the witness as to what Mantonya said is not apparent. The witness further testified that since the case had been going on he had caused Mantonya to be arrested and that the prosecution had been dropped, and also that Mantonya had been in witness' office repeatedly during the month next preceding his last examination. The cross-examination of Rosenstock concluded as follows: 'Q.—Are you willing to swear positively, at this time, that Mr. Mantonya did not say to you what you previously testified to?　A.—I answered that question before.　Q.—Well, let us have it again.　A.—I said no.　Q.—He never said it to you?　A.— I said I am not willing to swear.　Q.—That he did not?　A.—That he did not.'

"In calling this witness appellant utterly failed in his purpose. He was called to have him, if possible, retract his previous testimony, which he positively and repeatedly declined to do. It is useless to speculate on what influences may have been brought to bear on him to induce him to cast doubt on his previous testimony, but that some influence was used for that purpose is, we think, apparent.

"Hersey testified that there were three contracts,— one for $31,000, one for $41,000 and one for $55,000; that he signed the former two, but not the $55,000 one; that one of the contracts was to skin the lender of money; one, the $31,000 one, to skin Rosenstock; that all the certificates which were paid were issued on the $41,000 contract, and that the certificates and Kouhn's (the architect's) stubs would so show. He says, 'I am sorry I was a party to it, but I happened to get in the trap.' Appellant put in evidence a bill for mechanic's lien filed by Hersey against appellant to the October term, 1895, of the superior court of Cook county, in which the $31,000 contract was set up and relied on. The bill was signed

and sworn to by Hersey. The matter of that bill was, subsequently, settled by the parties. This evidence tended strongly to weaken Hersey's testimony that the work was done under a $41,000 contract. He explains it by saying that at the time of filing the bill he had not in his possession the $41,000 contract; that either Mantonya or Kouhn, the architect, had it; that he so told Runyan, his solicitor, and that Runyan told him that he would have to file a bill on the contract which he had in his possession and prove the existence of the other. This statement was not contradicted by evidence.

"Appellant was notified to produce the certificates. He produced three: one for $2000, which was the last paid, and which, with prior certificates, made up the $15,000 paid to Hersey; one for $3000, dated August 12, 1893, and one for $6600, dated August 25, 1893. The last two certificates were not paid, appellant claiming that they were wrongfully issued by Kouhn. The $2000 certificate was the only one of the certificates on which payments to the amount of $15,000 were made which was produced by appellant. He testified that he did not know where the others were. The original certificates produced are not before us, but only copies of them. The master, who saw the originals, found that where the figures 12 are, indicating the date of the $3000 certificate, there had been an erasure and the figure 2 had been written over what was erased; that the contract price was not stated in any of the certificates; that in the $2000 certificate, opposite the words 'contract price,' where the figures would be, and opposite the words 'balance due,' where the figures would be, there were erasures, and that the omission of the contract price and the erasures tended to create suspicion of the honesty of purpose of the architect or Mantonya or Hersey, or perhaps all three of them. The non-production of the other certificates, which appellant paid and which he must have had in his possession, is not a favorable circumstance for him.

- He testified that all certificates paid were in currency, so that he had no returned checks as evidence of payments, and that he kept no book accounts of payments made on certificates. The certificates, then, were the only documentary evidence of payments, and it was clearly his interest to preserve them, and it is apparent from the record that he was vigilant in guarding his interests. Not satisfied with Rosenstock advertising for bids, he advertised at the same time himself. He discharged Rosenstock because he could not agree with him about the work, and employed Kouhn. He discharged Kouhn on account of disagreement with him, and re-employed Rosenstock. He testifies that before he re-employed Rosenstock, and when the question was being discussed of the value of the labor and material in the building, he was careful to take down in a book which he had with him before the master, items of value stated verbally by Rosenstock, and, when called on to prove the cost of the completion of the building, he produced twenty-two architect's certificates and vouchers, which he had carefully preserved, as evidence of such cost. The evidence fails to show that he made any search for the certificates on which he paid Hersey. 'The mere withholding or failing to produce evidence which, under the circumstances, would be expected to be produced, and which is available, give rise to a presumption against a party.' 1 Jones on Evidence, sec. 17, and cases cited in note 1; *Rector* v. *Rector*, 3 Gilm. 105.

"George Reilly, appellee, examined September 23, 1896, testified that July 22, 1896, Kouhn, the architect, exhibited to him a book containing stubs of certificates issued to Hersey. Objection being sustained to evidence of the contents of the stubs, Kouhn, who was present and had been subpœnaed to produce the stubs and a postal card mentioned by Reilly, was called, and testified that he had given the postal card to Mantonya and that he could not find the other documents; that he had

moved three or four times, and had searched for but could not find them. Reilly was then permitted to proceed, and testified that by two of the stubs the contract price purported to be $47,000 and by a third $49,000; that on one stub issued on a $47,500 contract there was: 'Amount issued, $10,000; balance $37,500.' On another so purporting was: 'Contract price $47,500; total amount issued, $20,000; balance $27,500,' and that on the stub on which the contract price purported to be $49,000, the amount of the certificate was $3000. He also testified that the stubs showed the number of the building on which the certificates were issued and the dates of the certificates, but he could not recollect the dates. He said Kouhn turned over the stubs in the book and showed him the stubs he desired. He also testified that Kouhn offered the stub-book to him for $10, but he refused the offer. Kouhn was the next witness after appellee Reilly, on the same day. He was called by appellant, and testified that he saw the May 24, or $31,000, contract signed, and that he issued no certificates on any other contract or purporting to be on any other contract, but was not asked a single question as to whether there were such stubs in his stub-book as Reilly had testified he showed him, or whether he showed Reilly any stubs. In view of the fact that he was present when Reilly testified, and was called immediately after Reilly's examination, this omission could not have been an oversight, and is significant.

"About the middle of August, 1893, Reilly stopped work because he could get no money from either Mantonya or Hersey, and threatened not to proceed with the work unless he was paid. He and Hersey both testified that Mantonya, to induce Reilly to proceed with the work, promised him that if he would proceed, he, Mantonya, would see that he was paid; that if Hersey would not pay him he would, and that thereupon Reilly proceeded with the work and completed it, with the exceptions heretofore stated.

"In regard to Mantonya's testimony, it is sufficient to say, as does the master, in substance, in his report, that he denied everything, whether material or immaterial.

"The appellant claimed that in stating the account the master should have allowed him damages for delay in the completion of the work, but the master disallowed this claim, holding that the questionable relations existing between appellant and Hersey probably resulted in the abandonment of the work by the latter and was brought on by appellant's fault. It having been proved, however, that it probably cost appellant from $2500 to $3000 more to complete the work by reason of having to employ another contractor (who would figure higher, on account of things which he could not see,) than if it had been completed by the original contractor, $2500 was allowed to appellant in the statement of the account.

"The objection is made that the Artesian Stone and Lime Works Company was not made a party to the proceedings. Appellant put in evidence, on the hearing before the master, a declaration in assumpsit in the superior court of Cook county by the above named company, as plaintiff, against appellant and his wife, as defendants, alleging the delivery to Hersey, by contract with him, of 545 barrels of lime for use in appellant's building, and which was used in the building. Mantonya testified that the suit was still pending. No objection for want of parties was made either before the master or the court, and cannot be made here for the first time. *Portones* v. *Badenoch*, 132 Ill. 377; *Berndt* v. *Armknecht*, 50 Ill. App. 467.

"If the evidence on the question whether the price of $31,000 was fraudulently fixed by appellant and Hersey for the purpose of defrauding sub-contractors had been submitted to a jury in a case at law, and the jury had found affirmatively, as did the master, the verdict, in view of the conflicting evidence presented by the record, could not, on well settled principles, have been set aside,

and we cannot say that the master's finding on that question is not supported by the evidence.

"Counsel object that there is no finding of the master of the amount due the Powers Duplex Regulator Company. The master finds that January 6, 1894, Mantonya wrote a letter to the regulator company, which is set out in that company's cross-bill. The letter is not set out in appellant's abstract, but referring to the record we find it to be as follows:          " 'Chicago, *January 6, 1894.*

" '*Powers Duplex Regulator Co. 90 Illinois Street, City:*

" 'Gentlemen—You will please attach to the heaters in my flat buildings, 374, 376 and 378 Dearborn avenue, two of your one and three of your three-automatic regulators, for which I agree to pay $200 on the first day of March next.

" 'Yours truly,          L. B. Mantonya.'

"The master further finds that the regulators mentioned in the letter were put in and that nothing was ever paid for them. The names of the witnesses in respect to the claim of the regulator company are set down in the abstract, and after each is, 'Testified concerning claim of the Powers Duplex Regulator Company as to matters not here material.' None of the testimony of the witnesses in respect to the claim is abstracted. This being the case, it must be presumed that the evidence warranted the master's finding, which was, in substance, that the company was entitled to recover the amount mentioned in appellant's letter. The court decreed that amount, with interest, in favor of the company.

"Appellant's counsel object that appellees' petition, as amended, confines him to relief under section 45 of the statute; that the master erred in finding $6505 in appellant's hands after ascertaining the fair price of the work, as prescribed by section 29 of the statute; that the decree is erroneous in taxing against appellant the master's fees due from Reilly, the Powers Duplex Regulator Company and appellant, and in decreeing the sale of appellant's interest in the premises *en masse.* We think the

petition, as amended, sufficient on which to base the relief granted. The master's fees above mentioned were properly charged to appellant. The building was erected on one lot and the adjoining ten feet of another, was under one roof, and was properly decreed to be sold as a whole. *James* v. *Hambleton,* 42 Ill. 308; *Orr* v. *Northwestern Life Ins. Co.* 86 id. 260.

"Notice of lien not having been served on Ella W. Mantonya, her interest in the premises was held not chargeable.

"We find no reversible error in the record, or any error of which appellant has good cause to complain. The decree will be affirmed."

The abstracts and briefs filed in this court are substantially the same as those filed in the Appellate Court. The additional points relied upon by the appellant, as shown by his brief, are, that by the amendment to the original bill the contract price was not alleged to be a greater sum than originally alleged in the bill, and that the amendment did not bring the case within the exception or proviso of section 29, "that the owner and contractor fraudulently, and for the purpose of defrauding sub-contractors, fixed an unreasonably low price in their original contract for the erection or repairing of such building," and that the decree is not based upon sufficient averments. By an examination of the opinion of the Appellate Court it appears these questions were passed upon, discussed and decided, and the averments of the bill were sufficient to authorize the relief decreed. A careful consideration of the case convinces us that all the questions have been disposed of by the opinion of the Appellate Court, and we concur therewith.

The judgment of the Appellate Court for the First District is affirmed.            *Judgment affirmed.*