(No. 20167.—

STANLEY PIPAL, Defendant in Error, *vs.* GRAND TRUNK WESTERN RAILWAY COMPANY, Plaintiff in Error.

*Opinion filed October 25, 1930—Rehearing denied Dec. 6, 1930.*

DENT, DOBYNS & FREEMAN, for plaintiff in error.

JOSEPH D. RYAN, for defendant in error.

Mr. JUSTICE FARMER delivered the opinion of the court:

Stanley Pipal (hereafter referred to as plaintiff) brought an action under the Federal Employers' Liability act in the superior court of Cook county against the Grand Trunk Western Railway Company (hereafter referred to as defendant) for personal injuries received by him as its employee while serving under the direction of defendant's foreman or vice-principal in unloading and removing steel railroad rails from a freight car. The declaration consisted of five counts, and it alleged, in substance, that plaintiff's work constituted interstate commerce; that the defendant carelessly and negligently directed plaintiff and others to do work which it knew, or in the exercise of ordinary care would have known, was dangerous and unsafe; that defendant carelessly and negligently placed cross-ties which were old and inadequate across a ditch by the side of the

track on which the car loaded with rails was standing and that the rails were taken from the car and placed on these cross-ties; that plaintiff's position in unloading the rails required him to stand upon the rails and cross-ties; that the cross-ties broke in two, the rails fell down and thereby caused plaintiff's injuries. Defendant filed two pleas to the declaration—the general issue, and a special plea that plaintiff was not engaged in interstate commerce or in work of an interstate commerce character. The trial by a jury resulted in a verdict in favor of plaintiff for $40,000, upon which the court, after overruling a motion for a new trial, rendered judgment. Defendant perfected an appeal to the Appellate Court for the First District, where the judgment was affirmed, and the case comes to this court upon a petition for *certiorari*.

The most material question involved in the case is whether plaintiff at the time of his injury was engaged in interstate commerce or in work so closely related to it as to be a part of interstate commerce.

Plaintiff was thirty-two years old at the time of the accident and had been in the employ of defendant about two months as a section laborer under foreman Talladay. His general employment consisted of repairing the railroad tracks and replacing ties and steel rails. Prior to engaging in defendant's service he had operated a farm in Michigan. On August 4, 1928, one Varblow, defendant's track supervisor at Durand, Michigan, shipped from Durand to Blue Island, Illinois, over defendant's railroad line, Grand Trunk car No. 616208 and Rutland car No. 2311, loaded with railroad rails. The two cars were each consigned by separate bills of lading to defendant's track supervisor, J. Nolan, at Blue Island. The two cars arrived at Blue Island about four o'clock A. M. on August 6 and were set out by the train crew on a side-track about 600 feet south of the Grand Trunk station at Blue Island. Some four or five hours later, Wick, the yardmaster at Blue Island, and his

switching crew, moved these two loaded cars about 400 or 500 feet to No. 2 hold-track. The cars were switched to some extent during the same day to permit the moving of other interstate cars which had also been placed upon No. 2 hold-track. Nolan knew that the two cars of rails were coming to Blue Island, and when he learned of their arrival directed the two section foremen at Harvey and Blue Island to unload the rails as close to 139th street as possible. On the morning of August 7 the yardmaster, under orders received from Nolan through one of the section foremen, moved the two cars of rails from the hold-track to 139th street, a distance of about one-half mile, which street is the boundary line between Blue Island and the village of Posen. The cars were placed, or "spotted," for unloading purposes upon a lead-track which was parallel with and immediately west of defendant's east-bound and west-bound main tracks at 139th street. On the same morning plaintiff reported for work at the usual place in Harvey and commenced the replacement of ties in one of defendant's tracks there. Shortly thereafter his foreman, Talladay, took the section crew to 139th street by motor car, where they joined the Blue Island section crew under foreman Rimbaugh, and under directions of the foremen the two section gangs leveled off the dirt alongside the right of way fence and made a foundation of pine railroad ties upon which to pile the rails. Some of these ties had to be laid across a ditch which ran parallel with and near the unloading track. The Grand Trunk car was spotted just south of 139th street, in the village of Posen, and was the first car unloaded. Pine ties were placed at each end of the car while it was being unloaded and at right angles to the car so that the rails could rest upon them when dropped from the car. Eight men were used in the work of unloading. Two men were on the car, two men on the ground and four men on the rail pile—two at each end. Plaintiff was one of the men assigned to work on the south and west

sides of the rail pile. The rails were 33 feet long and weighed about eighty pounds to the yard. Rails were dropped alongside the car, but sometimes they would land under the car, and the men would lift first one end and then the other upon the foundation, where the rails were arranged in tiers. At about ten o'clock in the morning, while the unloading was in progress, foreman Rimbaugh told foreman Talladay that he looked at the foundation ties and they were not safe, and he suggested that he get more ties to put under the rails. Talladay replied that they were all right and told him to go ahead and unload the rails. The men proceeded with the work and finished unloading the first car, after which they moved it north across 139th street and then moved the Rutland car to the same place where they had been unloading the first car and proceeded to unload the rails from the Rutland car. This was a larger car, containing eighty or ninety rails. They unloaded about twenty-five rails off that car and then went to their lunch. After the men returned from lunch plaintiff heard one of the workmen tell foreman Rimbaugh there should be more ties placed under the rails, and the latter again spoke to foreman Talladay, after which plaintiff heard Talladay say for them to go ahead and put a few more rails on—that it was safe to work. Plaintiff could not see the ties from where he worked as the rails were between him and the ties. A few more rails were unloaded upon the ties and the foundation collapsed. Plaintiff was caught between the falling rails and both of his legs were very seriously injured. After the accident the laborers suspended work until the following day, August 8, 1928, when the balance of the rails upon the Rutland car were unloaded and placed in another pile just south of the pile of rails that had collapsed. The unloading of the Rutland car was completed on August 8 and the empty car started on its homeward journey to the State of Michigan about five o'clock on that day.

Defendant's contention is that plaintiff at the time of the injury was not engaged in interstate commerce or in work so closely related to it as practically to be a part of it; that the cars from which the rails were being unloaded were shipped from. Michigan, consigned by bill of lading to Nolan, the consignee, at Blue Island, and that after the cars reached their destination at Blue Island their interstate character ceased and the unloading of them was not an act of interstate commerce; that the cars had reached their destination when they arrived at Blue Island, and moving them to 139th street for unloading was an intrastate or local switching movement. Defendant further asserts that the consignee, Nolan, did not know the purpose for which the rails were to be used when the cars were unloaded, though the record shows that some of the rails unloaded from these cars were used a month or two later by an extra gang in the construction of railroad tracks Nos. 1 and 2 in the vicinity of 139th street, but the record discloses no survey to have been made for such extension work at the time of the accident. Plaintiff contends that the movement of the cars from Durand, Michigan, to 139th street, where they were to be unloaded, constituted one continuous movement in interstate transportation, and that the placing of the cars on the hold-track was a temporary interruption in transit and did not terminate their movement in interstate commerce.

Defendant relies very much upon *Chicago, Burlington and Quincy Railroad Co.* v. *Harrington,* 241 U. S. 177, and *Lehigh Valley Railroad Co.* v. *Barlow,* 244 id. 183. These two decisions do not control this case. In the *Harrington case* coal was brought from a foreign State into defendant's yards at Kansas City, Missouri, where it remained on storage tracks for more than a week and was then moved to a coal chute for unloading. The coal was owned by the railroad company, and after storage for a week or more was being switched to the chutes for unloading when the acci-

dent occurred to the plaintiff, who was a member of the switching crew. The court held the movement from the storage tracks to the chute for unloading was an intrastate haul. In the *Barlow case* cars of coal shipped from the State of Pennsylvania were placed on the railroad company's switch and side-tracks in its yards at Cortland, New York, where they remained for seventeen days and were then moved by a switching crew to a trestle within defendant's yards for unloading. The injury to Barlow, who was a member of the switching crew, occurred while the cars were being moved to the unloading trestle. The court held that the interstate movement terminated before the cars left the siding where stored. In the case at bar the consignee of the cars, Nolan, knew the cars were coming. They arrived between four and five in the morning of August 6, and a few hours afterward they were placed by the railroad yardmaster and his switching crew on the hold-track at Blue Island and Nolan learned of their arrival that day. He ordered them removed to 139th street for unloading. According to the testimony that was the only place to unload them and make it convenient for the subsequent use of the rails. Placing the cars on the hold-track was but a temporary interruption of the interstate shipment and did not terminate its character.

The proof in the record tends to show that the rails were to be used in replacing rails in defendant's interstate tracks. It is inferable that a survey had been made before that time, for the ends of some of the rails were sawed off and holes were drilled in them, which would not have been done if it had not been determined in advance where they were to be used. Some of the rails were afterwards so used. Defendant's contention is that it did not know at the time the property was received where the rails were to be used. Its records were in its possession and it could have introduced them had it seen fit. On the trial it did ask foreman Rimbaugh if he could tell from his record whether any of the

rails unloaded where plaintiff was hurt were used in the tracks that were replaced or re-built in November, to which plaintiff objected on the ground that the record should be produced in evidence, and the court sustained the objection. The failure of a party to a suit to produce evidence available to him gives rise to a presumption against him. (*Mantonya* v. *Reilly*, 184 Ill. 183; *Warth* v. *Loewenstein & Sons*, 219 id. 222; *Condon* v. *Schoenfeld*, 214 id. 226.) That the ends of some rails had been sawed off and holes drilled in them was a circumstance tending to prove that the rails were designed for a definite place. *Devine* v. *Delano*, 272 Ill. 166.

The Rutland car had been transported from Michigan to Illinois. All foreign cars travel on home route-cards, and in the absence of some definite order by the carrier they are to be routed back to the initial carrier or point of origin. A home route-card accompanying the car into this State acts as a guide for the return thereof to the owning road, and the movement of the car home after service in interstate commerce is regarded as a necessary incident to that commerce with respect to an employee. (*Director General of Railroads* v. *Bennett*, 268 Fed. 767; *Patterson* v. *Pennsylvania Railroad Co.* 284 Pa. 577, 131 Atl. 484.) In Roberts on Federal Liability of Carriers (vol. 2, 2d ed. sec. 748, p. 1436,) the author says: "But while it is true, as stated in the foregoing paragraph, that the interstate character of a car ordinarily ceases when it is delivered at the destination point to the consignee and unloaded, nevertheless, where it is intended that the car after being unloaded shall be returned by the carrier to the initial point in another State, its interstate status continues during the entire trip."

In *Trowbridge* v. *Kansas City and W. B. Railway Co.* 179 S. W. 777, an action was brought under the Federal Employers' Liability act to recover for personal injuries sustained by a switchman on a railroad extending from Kansas City, Missouri, to Dodson, Missouri. A loaded

box-car was shipped from Buffville, Kansas, over the Missouri Pacific railway and was received by the defendant railway company at Dodson and transported by it to the consignee at a point on its line in the State of Missouri. After the car was unloaded at the place of destination plaintiff was injured in switching it preparatory to returning it to Dodson, to be there taken up by the Missouri Pacific. The court said: "However, in the case now before us, plaintiff's injury occurred after the car had been unloaded and while he was switching it preparatory to taking it back to Dodson, where it could be taken possession of by the Missouri Pacific. Was the movement of this empty car a part of interstate commerce? We are of the opinion that it was, under the circumstances disclosed by this case. In the first place, the service undertaken by the defendant when it received the loaded car from the Missouri Pacific at Dodson was not finished until it had transported the car to its consignee and had returned it empty to Dodson and placed it again at the disposal of the Missouri Pacific. Under these circumstances the particular trip of this car from Buffville, Kansas, might be said not to have ended until it was returned empty to Dodson, since it was not the purpose of anyone that the car, when unloaded, should remain at the point of delivery to the consignee. The return of the car to Dodson was a necessary part of the movement of any cars carrying commerce from the State of Kansas to points in Missouri on defendant's line. To enable the railroad bringing freight from Kansas to such points to continue that commerce, certainly the cars, after they have been received and emptied of their goods, must be returned to that road."

The unloading of an interstate shipment is so closely related to interstate transportation as to be practically a part of it. (*Baltimore and Ohio Southwestern Railroad Co.* v. *Burtch,* 263 U. S. 544.) We repeat that the placing of the car on the hold-track prior to removing it to

139th street was but a temporary interruption of the interstate shipment and did not terminate its interstate character.

We are favored by counsel with the citation of a very large number of Federal and State cases. We refer to but a few of them which we think sustain the judgment: *Kusturin* v. *Chicago and Alton Railroad Co.* 287 Ill. 306; *Brown* v. *Illinois Terminal Co.* 319 id. 326; *Southern Railway Co.* v. *McGuin,* 153 C. C. A. 447, 240 Fed. 649; *Philadelphia, Baltimore and Western Railway Co.* v. *McConnell,* 228 Fed. 263; *Long* v. *Biddle,* 124 Ark. 127; *Kansas City Southern Railway Co.* v. *Martin,* 262 Fed. 241. These decisions all sustain the conclusion that plaintiff was engaged in interstate commerce at the time of his injury.

We do not think the contention of defendant that plaintiff assumed the risk of injury is tenable. Under the circumstances of the case he was warranted in believing the statement of the foreman that it was safe to continue the work. He did not know the condition of the foundation himself at all. The burden of proving that plaintiff assumed the risk or was guilty of contributory negligence was upon defendant. *Seaboard Air Line Railway* v. *Moore,* 228 U. S. 433; *Central Vermont Railroad Co.* v. *White,* 238 id. 507; *Fisher* v. *Chicago, Rock Island and Pacific Railway Co.* 290 Ill. 49.

Complaint is also made that the amount of damages assessed is excessive. Plaintiff was painfully and permanently injured. His left leg was amputated between the knee and ankle and his right ankle was stiffened and his foot of little use. He was rendered unable to do any work for which he was qualified. He was thirty-two years old, in good health and had been earning about $1000 a year. The question of damages is not open to us for review after having been approved by the Appellate Court. It was a question of fact and was conclusively settled by the Appellate Court's decision. *Smith* v. *Chicago, Peoria and St. Louis Railway*

Co. 236 Ill. 369; *St. Louis, Iron Mountain and Southern Railway Co.* v. *Craft*, 237 U. S. 648.

It is urged by defendant that the court erred in giving and refusing instructions. There is no merit in this argument, as defendant was not injured or prejudiced by any instruction given or refused.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*